# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01199-COA

**T.M.T., LLC D/B/A MIDTOWN WINE &**         **APPELLANT**
**SPIRITS, A MISSISSIPPI REGISTERED**
**SERVICE MARK**

**v.**

**MIDTOWN MARKET WINE & SPIRITS, LLC**         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/02/2019 |
| TRIAL JUDGE: | HON. SHEILA HAVARD SMALLWOOD |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | ANNA KATHLEEN RUSH |
| ATTORNEYS FOR APPELLEE: | MATTHEW D. MILLER |
| | NICHOLAS KANE THOMPSON |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 01/19/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., GREENLEE AND WESTBROOKS, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1. T.M.T., LLC, a Mississippi limited liability company doing business as Midtown Wine & Spirits, filed this appeal from the Forrest County Chancery Court's judgment. In this case over the use of a trade name and service mark, the court found that T.M.T. had the right to use the service mark "Midtown Wine & Spirits," that Midtown Market Wine & Spirits LLC did not infringe on T.M.T.'s service mark, and that "no likelihood of confusion" existed concerning the identity or association between the two businesses. The court denied T.M.T.'s requests for preliminary and permanent injunctions as well as attorney's fees. The court also

denied T.M.T.'s request for sanctions. T.M.T. appeals, claiming the chancery court erred by finding that its mark was generic, that Midtown Market Wine & Spirits had not infringed on T.M.T.'s mark, and that T.M.T. was not entitled to an injunction. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. T.M.T. (Midtown Wine & Spirits), which we will hereinafter call "T.M.T./Midtown," and Midtown Market Wine & Spirits, which we will hereinafter call "Midtown Market," are both liquor stores located in the Midtown area of Hattiesburg, Mississippi.[1] This case concerns whether one business is allowed the sole use of the term "Midtown" in its service mark.

¶3. On June 17, 2016, Michael Harrington filed a "Certificate of Formation" for a business with the Mississippi Secretary of State, creating T.M.T., LLC. On June 30, 2016, the newly formed T.M.T./Midtown signed a lease agreement for a building located on Hardy Street in Hattiesburg, Mississippi. T.M.T./Midtown desired to open a liquor store called "Midtown Wine & Spirits." A month later, the State of Mississippi issued T.M.T./Midtown an alcoholic beverage permit under the requested name, Midtown Wine & Spirits. In February 2017, T.M.T./Midtown opened its liquor store under the name "Midtown Wine & Spirits" and made its first sale. The name "Midtown Wine & Spirits" does not appear on the Certification of Formation or any of the company's annual reports. T.M.T./Midtown used the service mark "Midtown Wine and Spirits" in late February 2017. In September 2018,

---

[1] We will call the entities by the shortened name except where referencing the actual names, files, or record with state or governmental authorities.

T.M.T./Midtown registered its service mark of Midtown Wine & Spirits with the Mississippi Secretary of State. At the time, the Mississippi Secretary of State issued T.M.T., LLC a "Certificate of Service Mark Registration" for the phrase: "Midtown Wine & Spirits with Skyline Logo."

¶4. In May 2018, four months prior to T.M.T./Midtown registering its service mark of Midtown Wine & Spirits, Dr. Ted Harden Jr. filed a Certificate of Formation with the Mississippi Secretary of State forming "Midtown Market Wine & Spirits LLC." Dr. Harden testified that he chose the name "Midtown Market Wine & Spirits" because the owners of the Midtown Market shopping center in Hattiesburg approached him with the opportunity to open a liquor store under the name "Midtown Market." Dr. Harden then applied for an alcoholic beverage permit for "Midtown Market Wine & Spirits LLC" from the Alcoholic Beverage Control division of the Mississippi Department of Revenue.

¶5. Harrington contacted Dr. Harden in August 2018, requesting that Dr. Harden change his business's name. Dr. Harden refused, explaining that he had already registered his business name, signed a lease that required the business to bear the name "Midtown Market," and applied for an alcohol permit. Although Harrington filed an objection, the Mississippi Department of Revenue issued Dr. Harden's permit under the name of "Midtown Market Wine & Spirits LLC."

¶6. Midtown Market Wine & Spirits, located in the Midtown Market shopping center, opened for business in the summer of 2018 using a logo incorporating a corkscrew, the phrase "Midtown Market Wine & Spirits," and its address and phone number on a green

3

background.

¶7.     According to Harrington, after the opening of Midtown Market, there were several instances of customer confusion. Vendors delivered invoices meant for Midtown Market to T.M.T./Midtown. At one point, T.M.T./Midtown received an order from the Mississippi Department of Revenue; however, the shipping label bore Midtown Market's name. The Mississippi Department of Revenue also accidentally placed Midtown Market's name on T.M.T./Midtown's online account page. Regarding online confusion, a mix-up with both businesses' telephone numbers occurred on Yelp.com, and T.M.T./Midtown received a negative review on Google meant for Midtown Market. T.M.T./Midtown also received phone calls in which the callers intended to contact Midtown Market.

¶8.     In November 2018, Dr. Harden received a demand letter from T.M.T./Midtown's legal counsel insisting that he refrain from using the name "Midtown Market Wine & Spirits LLC." Again, Dr. Harden refused. In December 2018, T.M.T./Midtown filed a complaint requesting an injunction against Dr. Harden's business, "Midtown Market Wine & Spirits." T.M.T./Midtown sought to restrain Dr. Harden from using a trade name similar to "Midtown Wine & Spirits," which T.M.T./Midtown alleged would be likely to mislead, deceive, and create confusion in the public's mind. Dr. Harden denied having any knowledge of T.M.T./Midtown's name, business, or store, and he denied having any malicious intent. A trial commenced on May 14, 2019, and upon its conclusion, the chancery court took the matter under advisement.

¶9.     In its "Order and Final Judgment" dated July 2019, the court made detailed findings

4

of fact and conclusions of law. The court declared that although T.M.T./Midtown had the right to use the service mark "Midtown Wine & Spirits," it further found that the term "Midtown" in the parties' names was generic and geographical and not susceptible to protection. The court specifically found that "Midtown Wine & Spirits" and "Midtown Market Wine & Spirits" were not so similar as to deceive the public and that no likelihood of confusion existed; therefore, the use of the name "Midtown Market Wine & Spirits" did not infringe on T.M.T./Midtown's service mark of "Midtown Wine & Spirits." Now T.M.T./Midtown appeals the chancery court's determination that its mark was generic, that Midtown Market had not infringed on T.M.T./Midtown's mark, and that T.M.T./Midtown was not entitled to an injunction.

## STANDARD OF REVIEW

¶10.    The review of a chancellor's findings on appeal is limited. *McNeil v. Hester*, 753 So. 2d 1057, 1063 (¶21) (Miss. 2000) (citing *Reddell v. Reddell*, 696 So. 2d 287, 288 (Miss. 1997)). If supported by substantial evidence, a chancellor's factual findings will not be disturbed unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. *Varnell v. Rogers*, 198 So. 3d 1278, 1280 (¶7) (Miss. Ct. App. 2016). Questions of law are reviewed de novo. *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 14 (¶17) (Miss. 2007).

## DISCUSSION

**I.      Whether the chancery court erred by finding that Midtown Market had not violated Mississippi's Trademark Laws.**

¶11.    Mississippi's trademark laws protect registered trademarks. Miss. Code Ann. § 75-25-

1 (Rev. 2016). The Act defines a service mark as

> any word, name, symbol or device or any combination there of used by a person to identify and distinguish the services of one person, including a unique service, from the services of others, and to indicate the source of the services, even if that source is unknown . . . .

*Id*. § 75-25-1(b). The statute considers a service mark "used" when it is "used or displayed in the sale or advertising of services, and the services are rendered in [the] state." *Id*. § 75-25-1(h)(2). If the mark is registered with the state, the statute provides specific remedies for infringement. *Id*. § 75-25-23.

¶12.  A trademark right develops through the use of the mark, "not from mere adoption." *Daumit Stores Inc. v. Brown*, 249 Miss. 528, 163 So. 2d 466, 470 (1964); *see Russell v. Caroline-Becker Inc.*, 142 N.E.2d 899, 902 (Mass. 1957). A person may create an unregistered trademark, but that fact alone does not give him the right to prevent others from using it. *Id*. Although T.M.T./Midtown used the service mark "Midtown Wine and Spirits" for the first time in late February 2017, it did not register its service mark until September 2018—well after Midtown Market had registered its name as a limited liability company with the Mississippi Secretary of State. A person may not bar others from using the mark "if the likelihood of confusion between his product and the infringers is minimal or non-existent[.]" *Union Nat. Bank of Tex., Laredo v. Union Nat. Bank of Tex., Austin*, 909 F.2d 839, 843 (5th Cir. 1990). Therefore, one of the essential questions in a trademark infringement action is whether the contested mark is likely to cause confusion. *Citizens Nat'l Bank of Meridian v. Citizens Bank of Philadelphia*, 157 F. Supp. 2d 714, 716 (S.D. Miss. 2001).

¶13.  Trademark infringement claims consider the likelihood of confusion concerning the

source of goods or services. Miss. Code Ann. § 75-25-23 (Rev. 2016). The court determines the likelihood of confusion, evaluating several factors, "including the type of trademark at issue, the similarity of design; similarity of service; [the] identity of service facilities and customers; similarity of advertising media used; the defendant's intent; and actual confusion." *Citizens*, 157 F. Supp. 2d at 718; (quoting *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir. 1975)). T.M.T./Midtown takes issue with three of those seven factors: the type of trademark, the defendant's intent, and actual confusion.

### A.     Type of Trademark

¶14.    The starting point of a trademark infringement claim is determining whether the word or phrase is protectable. *Union*, 909 F.2d at 845. To make this determination, the court must determine in which category to place the word. *Id*. There are four categories of service marks: strong, descriptive, suggestive, and generic. *Citizens*, 157 F. Supp. 2d at 716. The type of mark determines which degree of protection it receives. *Id*. While strong service marks are entitled to the strongest protection, weaker marks receive little to none. *Id*.; *see also* Julius R. Lunsford, Jr., Trademark Basics, 59 Trademark Re. 873, 878 (1969). More specifically, a generic mark, as a service or trademark, receives no protection. *Citizens*, 157 F. Supp. 2d at 716. Generic marks communicate in general terms "information about the nature or class of an article or service." *Id*. (citing *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 (5th Cir. 1974)).

¶15.    The word "Midtown" is a common geographical term, generally used to indicate the

central part of a city between the uptown and downtown areas.[2] The general rule is that a generic or geographical term can acquire no proprietary rights. *Dixie Oil Co. of Ala. Inc. v. Picayune '66 Oil Co. Inc.*, 245 So. 2d 839, 841 (Miss. 1971). However, a geographical term can attain legal status by acquiring a secondary meaning. *Id*. A secondary meaning is achieved (1) through either a steady growth attributable to "substantial investment" into the business and considerable advertisement or (2) if the mark has become "broadly known throughout the public" as signifying a specific product source. *Id*. at 842.

¶16. There is no dispute that "wine" and "spirits" are generic terms. T.M.T./Midtown argues, however, that adding the word "Midtown" elevates the phrase to a protected mark status. The chancery court, serving as the finder-of-fact, disagreed. It held that "Midtown" was a generic term referencing a geographical location. The court explained that the term "Midtown" was commonly used to describe a general area of Hattiesburg, and because it was classified as a generic or geographical term, T.M.T./Midtown could acquire no proprietary rights. *Dixie*, 245 So. 2d at 841.

¶17. The use of the term "Midtown" does not identify liquor-store services but a general area of a city. The court in *Dollar Dept. Stores of Miss. Inc. v. Laub*, 120 So. 2d 139, 141 (Miss. 1960), explained:

> The owner of an original trademark has an undoubted right to be protected in the exclusive use of all the marks, forms or symbols that were appropriated as designating the true origin or ownership of the article or fabric to which they are affixed; but he has no right to the exclusive use of any words, letters, figures or symbols which have no relation to the origin or ownership of the goods, but are only meant to indicate their names or quality. He has no right

---

[2] *Midtown*, New Oxford American Dictionary 1108 (3d ed. 2010).

8

to appropriate a sign or symbol, which from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to employ, for the same purpose.

Anyone offering services in that particular area of Hattiesburg can equally employ the term "Midtown" in their business name. Furthermore, to establish that its mark had acquired a secondary meaning, T.M.T./Midtown was required to show that the name "Midtown Wine & Spirits" had acquired a special significance in the market for the products and services rendered. *See Laub*, 120 So. 2d at 141-42. T.M.T./Midtown relies on *Dixie*, claiming that "Midtown Wine & Spirits" acquired a secondary meaning since it passed the locality and advertising distinction set in *Dixie*.

¶18.    In *Dixie*, Dixie Oil Company of Alabama Inc. sought to prevent Picayune "66" Oil Company Inc., from using the trade name "Dixie Gas." *Dixie*, 245 So. 2d at 840. Dixie Oil also requested that the Mississippi Secretary of State cancel the registration of "Dixie Gas" as a trade name. *Id*. Dixie Oil stated that it started using the name "Dixie Gas" in 1960 and claimed an exclusive right to sell gasoline and petroleum products under that trade name. *Id*. However, Dixie Oil had not registered the term "Dixie Gas" as a trade name with the Secretary of State, which Picayune "66" had registered in early 1969. *Id*. The court explained that "Dixie" was a common geographical term for the southern part of the United States and, therefore, not subject to protection. *Id*. at 841. However, the court held that a generic or geographical trade name could gain a secondary meaning and protection based on proof that the public had come to associate the trade name with the producer of the products or through "a steady growth traceable to a substantial investment in the [business] and extensive

9

distribution of numerous advertisements, circulars, labels, etc." *Id*. at 842. Ultimately, the court held that Dixie Oil had not acquired a secondary meaning to the trade name "Dixie Gas" because Dixie Oil only used the name at some of its stations, and that because the parties were located over 100 miles apart, no competition existed between the two. *Id*.

¶19.    Unlike the businesses in *Dixie*, both T.M.T./Midtown and Midtown Market are located on Hardy Street in Hattiesburg approximately one mile apart. They serve the same market and customer base. Both businesses are also located in the Midtown area of Hattiesburg. While "[d]istance is a factor," it is "not a conclusive one[.]" *Mckay v. Legler*, 36 So. 2d 793, 794 (Miss. 1948).

¶20.    T.M.T./Midtown did not register its name "Midtown Wine & Spirits" immediately. The name used by T.M.T./Midtown first appeared when it opened for business in February 2017. T.M.T./Midtown registered the name with the Mississippi Secretary of State in September 2018. By establishing that T.M.T./Midtown did not assert its trade name consistently until it opened for business in February 2017, T.M.T./Midtown might not have a protected interest in the word "Midtown." *Dixie*, 245 So. 2d at 841 (finding that "Dixie Gas" was one of three trade names used by Dixie Oil, and therefore Dixie Oil had no protected interest in the name "Dixie Gas").

¶21.    T.M.T./Midtown also claims its business acquired a secondary meaning through "extensive marketing and advertising" years prior to Midtown Market opening, and through that advertising, "it established itself in the minds of its purchasers and customers that it was the wine and spirit provider [in the Midtown area.]" At trial, T.M.T./Midtown expressed that

10

T.M.T./Midtown advertised through social media and local publications. Midtown Market's owner, Dr. Harden, admitted he was unfamiliar with social media and relied on his staff to handle advertising. Noting that the record lacks any evidence from T.M.T./Midtown that the word "midtown" had become "broadly known throughout the public" as being associated with its store, the chancery court considered that information and had substantial evidence to support its decision that "midtown" had not acquired a secondary meaning. Thus, T.M.T./Midtown had no exclusive right to the word.

¶22.   A lack of a secondary meaning is not the only detail weakening T.M.T./Midtown's mark. Although a mark is classified, "that classification alone is not dispositive, and consideration must be given to other circumstances which bear on the strength of the mark, including third-party use." *Citizen*, 157 F. Supp. 2d at 717 (citation omitted). Extensive third-party use may weaken a mark and "negate any likelihood of confusion." *Id*. at 717.

¶23.   In *Sun Banks of Fla. Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981), the court contemplated the "extensive third-party use[s]" of the word "Sun" where a significant number of those uses fell within the same industry." The primary question before the court was whether a likelihood of confusion existed between "Sun Bank of Florida" and "Sun Federal Savings and Loan Association." *Id*. at 311. After considering the use of the word "Sun" within and outside the financial industry, the court held that evidence of a lack of confusion can be reflected through extensive third-party use. *Id*. at 316 (finding that the word "Sun" appeared in the name of 4,400 businesses, including a considerable number of financial institutions).

11

¶24. Midtown Market argues that third-party use of the word "Midtown" has undermined T.M.T./Midtown's infringement claim. Specifically, Midtown Market has identified third-party use of the word "Midtown" in at least eighty-two businesses in Mississippi and at least twelve businesses in Hattiesburg.

¶25. Based on the record, there was extensive third-party use of the word "Midtown" in Hattiesburg. The generic geographical word "Midtown" is used in connection with multiple types of products and services. A large number of businesses using this generic word weakens the strength of the mark. *Citizens*, 157 F. Supp. 2d at 717.

¶26. The chancery court concluded that T.M.T./Midtown's mark is relatively weak given the use of the common English terms "Wine & Spirits" with the extensive third-party use of the word "Midtown." We find no error in the chancellor's ruling.

### B. Intent

¶27. Another factor the court considers when analyzing an infringement claim is the defendant's intent. *Citizens*, 157 F. Supp. 2d at 716. "If the mark was adopted with the intent of deriving benefit from the reputation of [Midtown Wine & Spirits], that fact alone may be sufficient to justify the inference that there is confusing similarity." *Amstar Corp. v. Domino's Pizza Inc.*, 615 F.2d 252, 263 (5th Cir. 1980) (quoting Restatement of Torts § 729, cmt. (1938)). "Bad faith in the . . . use of a trademark normally involves the imitation of packaging material, use of identical code numbers, adopting of similar distribution methods or other efforts by a party to pass off its product as that of another." *Id*. at 263 (internal quotation marks omitted) (citing *Kentucky Fried Chicken Corp. v. Diversified Packaging*

12

*Corp.*, 549 F.2d 368, 382-83 (5th Cir. 1977)).

¶28. T.M.T./Midtown presented no evidence that Midtown Market had ever attempted to pass off its products or services as those of T.M.T./Midtown. At trial, the evidence established that the name "Midtown Market" was selected because the owners of the "Midtown Market" shopping center offered Dr. Harden an opportunity to open a liquor store in that shopping center under the name "Midtown Market Wine & Spirits." Dr. Harden testified he was unaware of T.M.T./Midtown's business, Midtown Wine & Spirits, its logo, or its location. The chancery court noted that a search of the Mississippi Secretary of State's website failed to identify "Midtown Wine & Spirits" because Harrington had registered the company as T.M.T., LLC and had not registered "Midtown Wine & Spirits" as a "fictitious" name of the company. Based on the lack of evidence, the chancery court declined to find that Midtown Market adopted T.M.T./Midtown's service mark with any intent to confuse, mislead, or deceive the public. Accordingly, we affirm the chancery court's judgment on this issue.

### C.     Actual Confusion

¶29. In an infringement action, it is not a requirement that actual confusion be shown. *Meridian Yellow Cab. Co. v. City Yellow Cabs*, 206 Miss. 812, 41 So. 2d 14, 17 (1949). Still, it is "the best evidence of likelihood of confusion." *Amstar Corp.*, 615 F.2d at 263; *see also Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 46 (5th Cir. 1975).

¶30. To establish a likelihood of confusion, "very little proof of actual confusion" is needed. *Streamline Prod. Sys. Inc. v. Streamline Manuf. Inc.*, 851 F.3d 440, 457 (5th Cir.

13

2017) (quoting *Xtreme Lashes LLC v. Xtended Beauty Inc.*, 576 F.3d 221, 229 (5th Cir. 2009)). "Testimony of a single known incident of actual confusion by a consumer has been found to be sufficient evidence to support [a] court's finding of actual confusion." *Id*. (citing *La. World Exposition v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984)). "However, not all confusion counts: evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks employed and it swayed consumer purchases." *Id.* (internal quotation marks omitted) (quoting *Xtreme Lashes*, 576 F.3d at 230).

¶31. The chancery court deemed it necessary to address T.M.T./Midtown's reliance on *Advance Medical Inc. v. Advanced Medical Systems Inc.*, 988 So.2d 424, 425 (¶3) (Miss. Ct. App. 2008). In *Advance Medical*, the chancery court prevented Advance Medical Inc. from using the name "Advance Medical" on the Mississippi Gulf Coast. *Id*. The court found that "Advance Medical," a generic mark, had acquired a secondary meaning warranting protection based on the six years of business and the reputation it had established on the coast. *Id*. at 426. Advance Medical System provided proof of lost business sales, serious billing issues, and mistakes regarding directions and customers' appointments. *Id*.

¶32. T.M.T./Midtown made a similar argument, claiming that an alcohol shipment was sent to the wrong store, invoices and past-due bills were charged to the wrong account, mail was delivered to the incorrect address, and calls from potential customers and employees to the wrong store all fueled daily confusion.

¶33. T.M.T./Midtown calls attention to six instances of alleged confusion. Most of the

evidence the court considered included testimony regarding "misdirected mail, calls, shipments, and a negative review intended for Midtown Market Wine & Spirits." Harrington testified that a package was delivered to his store listing the intended recipient as "Midtown Market Wine & Spirits." He later clarified that the package was intended for Midtown but had been mislabeled. T.M.T./Midtown's business also received a negative review meant for Dr. Harden's business. Dr. Harden testified that he had never spoken or given any information about his business to Google. Dr. Harden, as previously mentioned, delegated advertising to his staff because he was not technologically savvy. T.M.T./Midtown also claimed it had received invoices meant for Midtown Market's liquor store. However, on cross-examination, Harrington again clarified that the invoice correctly named his business and was meant for him. Harrington also submitted a "confusion log" where he documented alleged instances of confusion amongst employees, customers, and vendors. Although T.M.T./Midtown logged twenty-four incidents of confusion, Harrington admitted that the incidents involved a wrong number or were placed to T.M.T./Midtown for unknown reasons.

¶34. To prove the likelihood of confusion, T.M.T./Midtown needed to show "a probability of confusion, which is more than a mere possibility of confusion." *Elvis Presley Enters. Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998). T.M.T./Midtown only demonstrated a "mere possibility of confusion" because a number of instances of actual confusion proposed by T.M.T./Midtown were not actually a result of confusion and were cleared up on cross-examination.

¶35. Like the court in *Citizens*, the chancery court indicated that none of the incidents

15

logged by T.M.T./Midtown involved confusion on behalf of potential customers. *Citizens*, 157 F. Supp. 2d at 72. Most of the evidence presented by T.M.T./Midtown at trial was a fleeting mix-up that did not concern business transactions with likely customers.

¶36.    After assessing these factors, the chancery court, serving as the fact finder, determined "Midtown Wine and Spirits" and "Midtown Market Wine and Spirits" were not so similar that the public would be deceived and therefore, no likelihood of confusion between the parties' marks.

¶37.    We cannot find that the chancellor erred in so ruling.

**II.    Whether the chancery court erred by denying an injunction.**

¶38.    It is within the [chancery court's] discretion to grant or deny a request for injunction. *City of Durant v. Humphreys Cnty. Mem'l Hosp./Extended Care Facility*, 587 So. 2d 244, 250 (Miss. 1991). An injunction is warranted when "the [trade] name use, when not the same, [is] so similar that under the circumstances its use is reasonably calculated to deceive and result in injury, or it must be used fraudulently to have [that] effect." *Staple Cotton Co-op Ass'n v. Fed. Staple Cotton Co-op. Ass'n*, 162 So. 2d 867, 471 (Miss. 1964) (citing 18 C.J.S. *Corporations* § 173). Traditionally, when considering a request for injunctive relief, the court must consider four factors: "(1) . . . a substantial likelihood [exists] that the plaintiff will prevail on the merits; (2) the injunction is necessary to prevent irreparable harm; (3) the threatened injury to the plaintiff outweighs the harm an injunction might do to the defendants; and (4) granting a preliminary injunction is consistent with the public interest." *Lauderdale v. DeSoto Cnty. ex rel. Bd. of Supervisors*, 196 So. 3d 1091, 1099 (¶30) (Miss.

Ct. App. 2016) (quoting *Sec'y of State v. Gunn*, 75 So. 3d 1015, 1020 (¶14) (Miss. 2011)). While the requirements for permanent injunctive relief are substantially the same as a preliminary injunction, there is one exception. *Winter v. Nat. Res. Defense Council Inc.*, 555 U.S. 7, 32 (2008). In order to receive a permanent injunction, the plaintiff must prove "actual success on the merits" rather than a "substantial likelihood of success on the merits." *Id.*

¶39. The chancery court evaluated all four factors needed to grant an injunction. The court only had to "balance the . . . factors[,] not resolve all four factors in one party's favor or the other, to achieve equity and grant an injunction." *Gunn*, 75 So. 3d at 1021 (¶19); *see A-1 Pallet Co. v. City of Jackson*, 40 So. 3d 563, 569 (¶20) (Miss. 2010). Since T.M.T./Midtown's claims failed to conclusively prove "actual success on the merits," it is unnecessary to address the other three factors. T.M.T./Midtown is not entitled to legal protection for trademark infringement and therefore is not entitled to injunctive relief.

¶40. The chancery court concluded that equity dictated that an injunction should not be granted. We do not find an abuse of the chancery court's discretion in denying an injunction.

## CONCLUSION

¶41. There being no error, the judgment is affirmed.

¶42. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE AND McCARTY, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. SMITH, J., NOT PARTICIPATING.**